**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JERRY DAVIS,
                    *Plaintiff-Appellee,*

DUX CAPITAL MANAGEMENT
CORPORATION,
                    *Plaintiff-Appellee,*

                    v.

YAGEO CORPORATION; YAGEO
HOLDING (BERMUDA) LIMITED; YAN
SHENG CHAN; AN-EHR CHEN; CHENG-
LING LEE,
                    *Defendants-Appellants,*

EQUITY PLUS SECURITIES, LIMITED;
REX Y.C. YANG; WEN-CHIN YEH,
                    *Defendants-Appellants.*

No. 04-16911

D.C. No.
CV-03-00539-
WHA

DUX CAPITAL MANAGEMENT
CORPORATION; JERRY DAVIS,
                    *Plaintiffs-Appellants,*

                    v.

YAGEO CORPORATION; YAGEO
HOLDING (BERMUDA) LIMITED; YAN
SHENG CHAN; AN-EHR CHEN; EQUITY
PLUS SECURITIES, LIMITED; CHENG-
LING LEE; REX Y.C. YANG; WEN-
CHIN YEH; REXTRON INTERNATIONAL
LIMITED,
                    *Defendants-Appellees.*

No. 04-16973

D.C. No.
CV-03-00539-
WHA

DUX CAPITAL MANAGEMENT
CORPORATION; JERRY DAVIS,
              *Plaintiffs-Appellants,*

                    v.

YAGEO CORPORATION; YAGEO
HOLDING (BERMUDA) LIMITED; YAN
SHENG CHAN; AN-EHR CHEN; EQUITY
PLUS SECURITIES, LIMITED; CHENG-
LING LEE; REX Y.C. YANG; WEN-
CHIN YEH; REXTRON INTERNATIONAL
LIMITED,
              *Defendants-Appellees.*

No. 04-17272

D.C. No.
CV-03-00539-
WHA

DUX CAPITAL MANAGEMENT
CORPORATION,
              *Plaintiff-Appellant,*
                    and

JERRY DAVIS,
                    *Plaintiff,*

                    v.

E. LYNN SCHOENMANN,
              *Defendant-Appellee,*

GEORGE Q. CHEN,
                    *Appellee,*

YAGEO CORPORATION; YAGEO
HOLDING (BERMUDA) LIMITED; PIERRE
T.M. CHEN; REXTRON INTERNATIONAL
LIMITED; AN-EHR CHEN; YAN SHENG
CHAN; CHENG-LING LEE,
              *Intervenors.*

No. 05-16497

D.C. No.
CV-05-01364-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
September 12, 2006—San Francisco, California

Filed March 2, 2007

Before: Betty B. Fletcher and Marsha S. Berzon,
Circuit Judges, and David G. Trager,* Senior District Judge.

Opinion by Judge B. Fletcher

*The Honorable David G. Trager, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

**COUNSEL**

Robin Meadow (argued), Alison M. Turner, Eric R. Cioffi, Cynthia E. Tobisman, Greines, Martin, Stein & Richland LLP, Los Angeles, California, and William McGrane, Mau-

reen A. Harrington, McGrane, Greenfield, Hannon & Harrington, San Francisco, California, for defendants-appellants-cross-appellees-intervenors Yageo Corp., Yageo Holding (Bermuda) Ltd., An-Ehr Chen, Yan Sheng Chan, Cheng-Ling Lee, and Pierre Chen.

Rodney R. Patula (argued), Eric G. S. Marcks, Daniel T. Balmat, and Penn A. Butler, Squire, Sanders & Dempsey LLP, San Francisco, California, for plaintiffs-appellees-cross-appellants and plaintiffs-appellants Dux Capital Management Corp. and Jerry Davis.

Merle C. Meyers (argued), Kathy L. Quon, Goldberg, Stinnett, Meyers & Davis, San Francisco, California, for defendant-appellee E. Lynn Schoenmann.

K. John Shaffer, Stutman, Treister & Glatt, PC, Los Angeles, California, for cross-appellee-intervenor Rextron International Ltd.

Iain A. Macdonald, MacDonald & Associates, San Francisco, California, for appellee George Chen.

Jon R. Vaught, Vaught & Bourtris LLP, Oakland, California, for cross-appellees Equity Plus Securities, Ltd., Rex Y.C. Yang, and Wen-Chin Yeh.

---

## OPINION

B. FLETCHER, Circuit Judge:

These consolidated cases arise out of a corporate dispute between majority and minority shareholders over the minority shareholder's right to elect two of the five directors to the Long Life Noodle Company, Inc.'s board of directors. Plaintiffs Dux Capital Management Corp. and its agent, Jerry

Davis, alleged that: Defendants, Yageo Corp. and certain of its subsidiaries and employees who controlled the Long Life Noodle Company's board of directors, placed the corporation into bankruptcy without considering other alternatives that may have yielded greater value for the corporation and its shareholders. Defendants petitioned for bankruptcy in order to prevent plaintiffs, who were minority shareholders, from participating in the governance of the corporation. In bankruptcy, the equity of the minority shareholders was wiped out and the assets of the corporation were sold to one of defendant Yageo Corp.'s subsidiaries, Equity Plus Securities, Ltd., a secured creditor of LLNC.

In a jury trial, the jury found defendants Yageo Corp., Yageo Corp. subsidiaries Yageo Holding (Bermuda) Ltd. and Rextron International Ltd., and Yageo Corp. employees An-Ehr Chen, Yan Sheng Chan, and Cheng-Ling Lee[1] liable for breach of fiduciary duty. On appeal, defendants argue that plaintiffs lack standing to sue as assignees of the corporate claim and that their breach of fiduciary duty claims are pre-empted by federal bankruptcy law and barred by res judicata. The district court held that plaintiffs have standing and that their claims are neither preempted nor barred by res judicata. Plaintiffs cross-appeal the district court's damages calculations and its determination that they did not have standing to assert the claims of minority shareholders. Plaintiffs filed a separate appeal of the district court's refusal to entertain their Fed. R. Civ. P. 60(b) motion for post-judgment relief. In a related case, plaintiffs appeal from the district court's order affirming the bankruptcy court decision in an adversary proceeding against debtor George Chen (a founder of Long Life Noodle Company) and the Trustee of Chen's bankruptcy estate, E. Lynn Schoenmann. We affirm the district court on all issues.

---

[1]We refer to them collectively as the "Yageo defendants."

## I. FACTS AND PROCEDURAL HISTORY

### A. Yageo's Investment in LLNC

Long Life Noodle Company, Inc. ("LLNC"), was formed in 1996 by George Chen and George "Geordy" Murphy. In 1998, George Chen approached Pierre Chen, director and general manager/president of defendant Yageo Corp. ("Yageo") in Taiwan, about investing in LLNC. Pierre Chen directed An-Ehr Chen, his assistant, to investigate this investment opportunity. An-Ehr Chen recommended that Yageo invest through Rextron International Ltd. ("Rextron"), a wholly-owned subsidiary of another subsidiary, Yageo Holding (Bermuda) Ltd. ("Yageo Holding"), and Equity Plus Securities Ltd. ("Equity Plus"), another Yageo affiliate. Yageo Holding and Rextron were merely holding companies, and their investments were determined by Pierre Chen as general manager of Yageo.

In late 1998, Rextron invested approximately $1.2 million in LLNC in return for all of the preferred stock and some of the common stock and thereby became the majority shareholder. Murphy and George Chen owned the balance of the common stock as minority shareholders. After Rextron's initial investment, LLNC borrowed approximately one million dollars from Equity Plus. These loans were secured by all of LLNC's assets. The loans were negotiated by attorney Gayle Chan, whom LLNC hired to handle these transactions. She was Rextron's corporate counsel and she did not inform LLNC of this conflict of interest.

Under LLNC's Articles of Incorporation, Rextron could elect three of the five directors of the board. Rextron elected defendants An-Ehr Chen, Cheng-Ling Lee, and Yan Sheng Chan to the board, all of whom were Yageo employees. An-Ehr Chen was the assistant to the president of Yageo and a director of Rextron, Lee succeeded Pierre Chen as general manager/president of Yageo in 2000, and Chan was the vice-

president of Yageo. Murphy and George Chen at that point controlled two of the five seats on the board.

In February 2001, George Chen resigned as an officer and director of LLNC. Murphy resigned in March 2001. Their seats remained vacant after their resignations; this left control of the LLNC board of directors to Rextron. The LLNC By-Laws provided that board actions had to be unanimous, and unanimity could be achieved since only Rextron-controlled directors remained on the board.

## B.   Chen-Dux Settlement

Around the same time period, George Chen was involved in separate litigation with Dux Capital Management Corp. ("Dux") and Jerry Davis, Dux's agent.[2] In September 1998, Dux lent Chen $150,000, for which Chen executed a promissory note to Dux secured by Chen's stock in LLNC. Chen defaulted on the loan, and Dux demanded repayment. In March 2000, Chen sued Dux in California state court for declaratory relief, alleging that he never received the $150,000. Dux cross-claimed. On April 25, 2001, Chen and Dux entered into a settlement agreement. Pursuant to the settlement agreement, Chen was to transfer 200,000 shares of common stock in LLNC and voting proxies for all of his 411,538 shares (including the 200,000 transferred) to Dux. These shares were to be held in escrow for Dux "pending the expiration of the right of first refusal described in the Long Life Noodle Company Shareholder Agreement."[3] Settlement Agreement and Mutual General Release ("Settlement Agreement") ¶ 1. Dux had the right to vote the 200,000 shares pending expiration or exercise of the right of first refusal. Moreover, Paragraph 12.18 of the Settlement Agreement expressly provided, "A finding by the court that this Agree-

---

[2]Jerry Davis holds an unlimited power of attorney from Dux for all matters related to Dux's interest in LLNC.

[3]LLNC and other shareholders had the right of first refusal.

ment is in good faith under [California] Code of Civil Proce-dure Section 877.6 is a condition to the validity and enforceability of this Agreement." *Id.* ¶ 12.18. The California superior court made this good faith determination on July 25, 2001 and approved the settlement agreement. Chen trans-ferred 200,000 of his shares and voting proxies for all his shares to Dux.

## C.   LLNC Directors' Decision to File Bankruptcy

On April 26, 2001, the day after Chen and Dux reached their settlement agreement, Dux and Davis demanded a meet-ing of the shareholders to elect directors to the two vacant seats on the board. Dux's counsel, Lorne Polger, sent a formal demand letter on April 30, 2001. After receiving plaintiffs' demand, Rextron and its representatives, particularly An-Ehr Chen and Gayle Chan, discussed ways to prevent plaintiffs from voting directors to the board and participating in the management of the corporation. Defendants began to consider bankruptcy at the end of April or beginning of May 2001.

The LLNC By-Laws provided that shareholders were to elect directors at the annual meeting on May 1. No meeting was held on May 1, 2001. From May 1 to May 3, the directors and Rextron attorneys continued to discuss options for pre-venting the minority shareholders from electing their two directors. On May 3, 2001, the board of directors (consisting of three directors elected by Rextron) unanimously voted to petition for bankruptcy. The By-Laws required any action taken by the board to be unanimous.

On May 4, Polger faxed another letter to LLNC and Rex-tron attorneys demanding a meeting and an inspection of LLNC's books and records. Rextron counsel Gayle Chan denied this request on May 7, 2001, and even though she knew of the board's resolution to pursue bankruptcy, she stated that she would try to arrange for an inspection on May 15. Also on May 7, 2001, An-Ehr Chen, on behalf of Rextron,

requested that LLNC's board convert 700,000 of Rextron's preferred shares to common. The LLNC board granted this request by unanimous written consent. On May 9, 2001, LLNC filed its petition for bankruptcy.

## D. Proceedings in Bankruptcy Court

On July 9, 2001, Dux moved for appointment of a Chapter 11 trustee for cause "on the grounds of dishonesty, gross mismanagement and breach of fiduciary duty." Dux Capital's Mot. to Appoint Chapter 11 Trustee at 1. Among other things, Dux alleged that Rextron "orchestrated and carried out a systematic plan to control the Debtor [LLNC] in order to ensure that its interests were protected to the detriment of the Debtor's legitimate creditors, including Dux," *id.*, that Rextron refused to hold the annual shareholder meeting in order to prevent Dux from filling the two vacant seats on the board of directors, and that Rextron, through its control of LLNC, breached its fiduciary duty to creditors and the estate and committed fraud by failing to give full and honest disclosure of its financial condition.

On August 29, 2001, LLNC filed its Chapter 11 plan of reorganization. In October 2001, Dux filed an objection to confirmation of the plan. Dux asserted that Rextron had breached its fiduciary duty by not holding a shareholder meeting according to the By-Laws. At a hearing on October 11, 2001, the bankruptcy court appointed a Trustee to address whether any amendments to the plan were necessary in order for the plan to be considered fair. The Trustee, David Bradlow, recommended adoption of the plan with some modifications. The bankruptcy court confirmed the plan with minor modifications. The court's order provided, "All claims, defenses, causes of action, and objections to claims are reserved *for the benefit of the estate and may be asserted by the Disbursing Agent*."[4] Order Confirming Debtor's Chapter

---

[4]The Disbursing Agent was David Bradlow, the former Trustee.

11 Plan of Reorganization Dated August 29, 2001 ("Confirmation Order") ¶ 10 (emphasis added). Rextron and Equity Plus objected to the Trustee's report and recommendation, but the bankruptcy court overruled their objections.

Under the plan, Equity Plus acquired the assets of LLNC. As a primary unsecured creditor, Rextron received cash for its loans. The equity of the minority shareholders was eliminated. However, the bankruptcy court approved an assignment to Dux and Davis of all pre-petition claims for relief LLNC owned against the majority shareholder, its directors, and affiliates. The Disbursing Agent negotiated this assignment with Dux and Davis in exchange for their waiver of all their general unsecured claims against the estate except for administrative expenses. Rextron and Equity Plus objected to this assignment. The bankruptcy court overruled these objections and stated in its order:

> The Disbursing Agent is authorized to transfer and assign to Davis/Dux certain of Debtor's claims that existed on May 9, 2001 (i.e., immediately prior to the Chapter 11 filing), as described in and according to the terms of the Letter Agreement. The Disbursing Agent makes no representation that the Debtor had any valid claims, rights or causes of action on May 9, 2001, and nothing contained in this Order shall be deemed to constitute a finding as to the existence of any such[ ] cla[i]ms, rights or causes of action.

Order Authorizing Compromise of Controversy and Assignment of Claims ("Order Authorizing Compromise") ¶ 6.

### E.   Proceedings in the District Court

In early 2002, Geordy Murphy, Davis, and Dux filed suit against the Yageo defendants in California state court. They alleged, among other things, breach of fiduciary duty, RICO violations, fraud, conspiracy to commit fraud, violation of the

state unfair competition law, breach of contract, and malicious prosecution. Plaintiffs sued on the assigned corporate claim ("LLNC claim") in place of the corporation, alleging that the directors had breached their duty to the corporation and its shareholders by causing loss in value of all the corporation's stock. Plaintiffs sued on their own claims as minority shareholder ("Minority Shareholder claim") in a direct action against the majority shareholder, Rextron, for breaching its fiduciary duty to them by preventing them from electing their two directors to the board and causing loss in share value.

Dux and Davis also filed a separate complaint containing similar allegations in California superior court. Both cases were removed to the federal district court in 2003 under 28 U.S.C. § 1441(b) and (c). They were consolidated on May 1, 2003.

In January 2004, defendants moved for summary judgment on the ground that all of Dux's claims were barred by res judicata. They argued that the bankruptcy court already ruled on Dux's claims in its order confirming the LLNC reorganization plan and that any issues not ruled on should have been asserted in the bankruptcy court. On March 12, 2004, the district court granted in part and denied in part defendants' summary judgment motion. The district court held that res judicata barred Dux's post-petition claims — claims that collaterally attacked the decisions and orders of the bankruptcy court. Dux and Davis do not appeal that portion of the district court's order.

However, the district court denied defendants' motion for summary judgment as to plaintiffs' pre-petition claims — claims arising out of events occurring prior to the filing of the bankruptcy petition. The district court held, "the bankruptcy court did not adjudicate plaintiffs' pre-petition claims against non-debtor defendants to the extent plaintiffs did not seek to recover from the debtor. Pre-petition claims against a non-debtor [are] normally nondischargeable." Order Granting in

Part Defendants' Mot. for Summary Judgment ("Summary Judgment Order") at 17. That is, pre-bankruptcy claims against the Yageo defendants — who were not the debtor — were not disposed of in the bankruptcy court. Moreover, the district court noted that the bankruptcy court preserved these pre-bankruptcy claims against the non-debtor defendants by assigning them to plaintiffs Dux and Davis.[5]

The case proceeded to a jury trial. At the end of plaintiffs' case, defendants moved for judgment under Fed. R. Civ. P. 50(a). The district court granted this motion with respect to all claims except the LLNC and Minority Shareholder claims. In the midst of trial, defendants raised a standing issue, arguing that Dux did not have standing to sue on the Minority Shareholder claim because the Chen-Dux settlement was not finalized (and therefore Dux did not own the 200,000 LLNC shares) until July 25, 2001, after the bankruptcy petition was filed. The district court reserved this issue until after trial, directing the jury to assume that plaintiffs had standing.

## F. Jury Instructions and Verdict

The parties dispute whether the jury determined that plaintiffs Dux and Davis suffered any damages prior to May 9, 2001, the date LLNC filed for bankruptcy. One of the jury instructions provided:

> If you find that plaintiffs have proven any liability
> by any defendant, then you would have to decide
> whether plaintiffs have proven by the preponderance
> of the evidence any damages. To do so, plaintiffs

---

[5]The district court also held that because Geordy Murphy was never assigned the rights of LLNC, he could not assert any claims on behalf of LLNC as an assignee. Summary Judgment Order at 17 ("His claims are limited to personal claims against moving defendants or claims as a shareholder against directors of LLNC."). Geordy Murphy is not a party to these appeals.

> would have to prove the value of the shares held by the common stockholders as of the date of the decision to commence bankruptcy proceedings. The measure of damages would be the value of those shares *as of that date* less the *expected value* of those shares in bankruptcy proceedings *expected as of the date of the board's vote*.

Jury Instruction XXXVIII (emphasis added). The jury was also instructed, "[i]n this case, plaintiffs challenge [the directors'] *decision* to commence bankruptcy as having not been in the best interests of the corporation," Jury Instruction XIX (emphasis added), and "[l]iability in this case depends, in the first instance, upon whether the *board's decision to commence* bankruptcy proceedings was improper," Jury Instruction XXIX (emphasis added).

With respect to the LLNC claim, the jury determined after a first round of deliberations that the three Rextron-controlled directors (An-Ehr Chen, Cheng-Ling Lee, and Yan Sheng Chan) had breached their fiduciary duties owed to the corporation and common shareholders in connection with the vote to commence bankruptcy proceedings. The jury initially delivered an inconsistent verdict with respect to the harm caused by defendants' breach of fiduciary duty. In response to Question One of the Special Verdict Form — "Have plaintiffs proven by a preponderance of the evidence that the common stock of Long Life Noodle Company, Inc., had any value as of the company's petition to commence bankruptcy proceedings on May 9, 2001?" — the jury answered, "No." However, in response to Question Six — "If you have determined that any defendant has liability, what damages, if any, have plaintiffs proven by preponderance of the evidence?"— the jury answered, "$400,000." After discussing this inconsistency with the parties, the district court gave the following curative instructions to the jury:

[O]ur intent was . . . to ask you to tell us what value, if any, the stock had immediately before the bankruptcy proceedings commenced. . . .

And I want you to understand [question] number 1 to mean that it is have plaintiffs proven by a preponderance of the evidence that the common stock of Long Life Noodle Company, Inc. had any value as of immediately before the company's petition to commence bankruptcy proceedings on May 9, 2001.

Before giving these curative instructions, the district court re-read Jury Instruction XXXVIII twice.

After receiving the curative instructions, the jury returned with a consistent verdict. With respect to the Minority Shareholder claim, the jury determined that Rextron breached its fiduciary duty as a majority shareholder to the minority shareholders. The jury found $400,000 in damages.[6] The jury also determined that the total dollar value of the 200,000 shares transferred from George Chen to Dux in their settlement agreement as of May 9, 2001, was $2 per share and $400,000 total.[7]

## G.   District Court Ruling on Standing and June 30, 2004 Judgment

On June 30, 2004, the district court returned to the standing issue it had set aside during trial. It held that Dux and Davis did not have standing to assert the Minority Shareholder

---

[6]The jury also awarded punitive damages against An-Ehr Chen and Rextron. Those damages were vacated by the district court and are not at issue on appeal.

[7]Plaintiffs' evidence of the value of the common shares consisted of the terms of the Chen-Dux Settlement Agreement, which assigned a value of $2 per share to the common shares, "which the parties [Chen and Dux] acknowledge and agree is their good faith estimate of the current fair market value of the Shares." Settlement Agreement ¶ 1.

claim, because they did not have any legal rights to the shares prior to the bankruptcy petition that was filed on May 9, 2001. *See Dux Capital Mgmt. Corp. v. Chen*, Nos. C03-00539WHA, C03-00540WHA, 2004 WL 2472247, at \*3-5 (N.D. Cal. June 30, 2004). Accordingly, the district court set aside the jury's verdict against Rextron based on its breach of fiduciary duty to the minority shareholder.

Defendants also argued in its post-trial brief on standing that plaintiffs failed to prove an assigned claim for breach of fiduciary duty to the corporation because no damages to the corporation had accrued as of the time immediately prior to the bankruptcy filing. *Id.* at \*6. The district court noted that although "this issue is outside the scope of the standing issue reserved by the Court," it would address it because "[d]efendants may have believed there was some latitude . . . due to the Court's request for precise information on what the trial record showed was the number of common shares outstanding as of May 9, 2001." *Id.* The district court held that plaintiffs had standing to sue on the assigned LLNC claim because a breach of fiduciary duty claim accrued when the directors decided to file for bankruptcy on May 3, 2001. *Id.* at \*6-7. With respect to the LLNC claim, then, the district court entered judgment for plaintiffs Dux and Davis against defendants An-Ehr Chen, Yan Sheng Chan, Cheng-Ling Lee, Yageo, and Yageo Holding. The district court held that these defendants were jointly and severally liable to Dux and Davis as assignees of the corporate claim in the amount of $2,692,306 ($2 per share as found by the jury x 1,346,153 common shares). *Id.* at \*7.

## H.   Defendants' Fed. R. Civ. P. 50(b) Motion

Defendants sought judgment as a matter of law ("JMOL") on five renewed motions. *See Dux Capital Mgmt. Corp. v. Chen*, Nos. C03-00539WHA, C03-00540WHA, 2004 WL 1936309, at \*7 (N.D. Cal. Aug. 31, 2004). Two are relevant here: First, defendants contended that the LLNC claims were

not valid because these claims did not accrue prior to the bankruptcy petition filing on May 9, 2001. Defendants raised this issue for the first time in their post-verdict brief concerning standing. *See id.* at *16. The district court affirmed its earlier ruling that damages occurred at the time the decision to commence bankruptcy was made and accordingly denied defendants' motion for JMOL on the assigned claims. *Id.* at *16-18. Second, defendants contended that all of plaintiffs' claims were preempted by federal bankruptcy laws and barred by res judicata. Defendants failed to raise the preemption issue before the jury verdict, and the district court had already held in its summary judgment order that res judicata did not bar plaintiffs' pre-petition claims. The district court denied defendants' motion regarding preemption and res judicata, holding that the pre-petition claims were not preempted because the bankruptcy court properly reserved them for litigation in another forum and that its earlier res judicata ruling was law of the case. *Id.* at *18-19.

The district court granted defendants' request to exclude Rextron's eventual common shares (the 700,000 shares converted from preferred to common) from the damages calculation. Defendants argued that damages on the assigned LLNC claim must exclude Rextron's shares because there were only 646,153 shares of common stock as of the directors' resolution to petition for bankruptcy on May 3, 2001. The parties had proffered 1,346,153 shares of common stock in their post-trial briefs on standing. *See id.* at *18. The district court amended the judgment entered on June 30, 2004 to hold defendants An-Ehr Chen, Yan Sheng Chan, Cheng-Ling Lee, Yageo, and Yageo Holding jointly and severally liable in the sum of $1,292,306 ($2 per share x 646,153 shares). *Id.* at *19.

## I. Plaintiffs' Post-Judgment Fed. R. Civ. P. 60(b) Motion

After the district court entered its Amended Judgment on August 31, 2004, plaintiffs moved to vacate the judgment and

the district court's ruling on Dux's standing as a minority shareholder, "subject to Plaintiffs' filing and service herein of a ratification, pursuant to Fed. R. Civ. P. 17(a), by Mr. George Chen of the commencement and maintenance of this civil action upon the claims of the minority shareholder, and amending the Amended Judgment entered herein on August 31, 2004 to reinstate the jury's verdict for Dux on those claims for relief." Notice of Mot. and Mot. by Pls. for Relief from Judgment at 1. The district court denied this motion. Plaintiffs appealed. Defendants moved to dismiss the appeal for lack of jurisdiction. Plaintiffs opposed the motion and moved for limited remand to the district court to rule on the merits of their Fed. R. Civ. P. 60(b) motion. The Appellate Commissioner denied both motions on January 5, 2005.

## J.   Dux's Adversary Proceeding Against George Chen

After Dux filed its appeal to this court seeking review of the district court's denial of its request to entertain Dux's Rule 60(b) motion, Dux sought George Chen's ratification of the Minority Shareholder claim under Fed. R. Civ. P. 17(a). Dux sought ratification as a way around the district court's standing ruling: if it did not have standing, it would obtain the claim from the person who did. On July 25, 2003, however, Chen had filed his own bankruptcy petition, which was converted into a Chapter 11 proceeding on August 8, 2003. The Trustee, E. Lynn Schoenmann, was appointed on August 28, 2003. Dux commenced an Adversary Proceeding in bankruptcy court on November 2, 2004. In its amended complaint filed on November 17, 2004, Dux argued that it had been deprived of the "mutually intended benefit of its bargain" gained from entering into the Chen-Dux settlement because the 200,000 shares transferred therein had become worthless as a result of the bankruptcy. Dux sought specific performance of Paragraph 12.2 of the Settlement Agreement, which provided that the parties were to "take all actions as may be reasonably required to effectuate this Agreement," and it

argued that Chen was obligated to ratify its direct action against the Yageo defendants.

Chen moved to dismiss on the ground that he had no authority to ratify because a Trustee had already been appointed to his bankruptcy estate. The Trustee moved for summary judgment on the ground that the Settlement Agreement created no obligation to ratify the suit or otherwise transfer Chen's claims against the Yageo defendants to Dux. Dux moved for partial summary judgment on liability for breach of the agreement and requested declaratory relief and specific performance.

The bankruptcy court granted Chen's and the Trustee's motions and denied Dux's motion. Dux appealed to the district court. The district court held that Fed. R. Civ. P. 17(a) is not a substantive rule creating any right to ratification and the settlement agreement does not otherwise obligate the Trustee to transfer the Minority Shareholder claim to Dux. The district court also clarified that even if Dux obtained judgment against the Trustee, Chen could not be personally bound to that judgment because the claim was an asset of the estate that was no longer owned or controlled by Chen.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the appeal and cross-appeal of the district court civil judgment under 28 U.S.C. § 1291 and jurisdiction over the appeal arising from the Chen bankruptcy under 28 U.S.C. § 158(d).

We review questions of preemption, standing, availability of damages, and the denial of summary judgment on res judicata grounds de novo. *See, e.g., Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 816 (9th Cir. 1992); *Mortensen v. County of Sacramento*, 368 F.3d 1082, 1086 (9th Cir. 2004); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1197 (9th Cir. 2002); *Akootchook v. United States*, 271 F.3d 1160, 1164

(9th Cir. 2001). A motion for judgment as a matter of law is reviewed de novo. *See, e.g., City Solutions Inc. v. Clear Channel Commc'n, Inc.*, 365 F.3d 835, 839 (9th Cir. 2004). In reviewing a judgment as a matter of law, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000).

This court reviews de novo questions of jurisdiction concerning Fed. R. Civ. P. 60(b) motions. *Carriger v. Lewis*, 971 F.2d 329, 332 (9th Cir. 1992) (en banc). The interpretation of language in a contract is a question of law reviewed de novo. *See United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1264 (9th Cir. 2003).

## III.   DISCUSSION

### A.   Standing

#### 1.   Plaintiffs Have Standing to Litigate the Assigned LLNC Claim

**[1]** In order for plaintiffs to have standing, they must show that they suffered an injury in fact, there was a causal connection between the injury and the conduct complained of, and the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

**[2]** Defendants argue that Dux and Davis lack standing to raise the LLNC claims because they were assigned only claims that accrued as of immediately prior to the bankruptcy filing, and no such claims accrued as of that date because plaintiffs suffered damages only when the bankruptcy petition was filed. Plaintiffs argue that the jury found damages as of the LLNC board of directors' *decision* to file bankruptcy on May 3, 2001, and therefore the LLNC claim accrued on that date. Thus, the question is whether the jury found actual dam-

ages before May 9, 2001. Under California law, a cause of action accrues with "the infliction of appreciable and actual harm, however uncertain in amount." *Davies v. Krasna*, 535 P.2d 1161, 1169 (Cal. 1975).

Plaintiffs had standing to assert the LLNC claim because they suffered harm before May 9, 2001. Several of the original jury instructions clearly asked the jury whether the defendants breached their fiduciary duty as a result of the LLNC board's decision to file bankruptcy on May 3, 2001, and the jury's original verdict found several defendants had breached their duty on this basis. We agree with the district court's analysis:

> Defendants' argument fails to consider the main factual issue for the jury: whether the directors on the board breached their fiduciary duty by choosing the bankruptcy alternative rather than some other course of action expected to provide the company and its shareholders with more value. The directors decided to file for bankruptcy on May 3, 2001. It is at this point in time that a breach of fiduciary duty claim may have accrued. If plaintiffs' damages were reasonably certain and not speculative at the time of wrongdoing, then the cause of action accrued.

*Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at * 6 (citations omitted).

Believing that the jury may have interpreted Question One on the special verdict form to ask what the value of the stock was "once the bankruptcy proceeding started" — that is, after the bankruptcy petition was filed — the district court re-instructed the jury. In giving its curative instruction, the district court first re-read Jury Instruction XXXVIII, which stated in part, "plaintiffs would have to prove the value of the shares held by the common stockholders as of the date of the *decision* to commence bankruptcy proceedings." Jury Instruc-

tion XXXVIII (emphasis added). The district court explained to the jury that if it construed Question One to mean "upon filing and commencing the bankruptcy petition, did the stock have value at that point," "then that was not our intent." The court further explained:

> Rather, what our intent was was to ask you to tell us what value, if any, the stock had immediately before the bankruptcy proceedings commenced. . . . have plaintiffs proven by a preponderance of the evidence that the common stock of Long Life Noodle Company, Inc. had any value as of immediately before the company's petition to commence bankruptcy proceedings on May 9, 2001.

> . . . it is a before and after comparison. If you were to find that there were any value immediately before and that that got wiped out in the bankruptcy *and that there was another alternative that would have preserved more value to the shareholder*s, then that is what we are trying to get at . . . .

(Emphasis added).

**[3]** Seizing upon this curative instruction, defendants argue on appeal (as they argued below) that the district court told the jury to ignore May 3, the date of the decision to file, and instead instructed it to compare the loss caused by the actual filing of the petition on May 9. *See Dux Capital Mgmt. Corp.*, 2004 WL 1936309, at *16-17. But the district court did not tell the jury to ignore May 3. The jury determined that LLNC common stock had a value of $2 per share prior to defendants' decision to commence bankruptcy proceedings on May 3, 2001, and that this stock had no expected value after the defendants' decision. *See id.* at *16-18. This is clear in light of the district court's concern that the jury had originally interpreted Question One to mean the value of the shares *after* the bankruptcy petition and its addressing this by reminding

the jury of Jury Instruction XXXVIII[8] while giving its curative instruction. *See id.* at *17-18. Hence, plaintiffs had standing to assert the LLNC claim because it accrued before May 9, 2001.

## 2. Plaintiffs Lack Standing to Litigate the Minority Shareholder Claim

The standing issue as to the Minority Shareholder claim is whether the Chen-Dux Settlement Agreement gave Dux any legal right to the LLNC shares and endowed it with standing as of May 9, 2001. Dux bases its standing to sue as a minority shareholder for breach of fiduciary duty by the majority shareholder, Rextron, on the 200,000 common shares of LLNC transferred pursuant to its settlement with Chen. Because the Settlement Agreement does not assign Chen's accrued legal claims as a shareholder to Dux, Dux only would have standing to sue for loss in share value caused by Rextron's breach of fiduciary duty if it actually owned those shares at the time the injury occurred. Neither party disputes that the Chen-Dux Settlement Agreement was executed on April 25, 2001, that it contained a good-faith determination provision, and that a California court did not make this good-faith determination until July 25, 2001. The district court held that the settlement agreement could not be construed to provide Dux any legal right to the LLNC shares prior to May 9, 2001. *Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *3. On cross-appeal, Dux and Davis argue that the issue is not whether they had standing to sue as minority shareholder, but

---

[8]This key instruction asked the jury to determine "the difference between the *expected* value of the shares with Long Life pursuing the bankruptcy option versus the *expected* value of the shares with Long Life pursuing alternative options, all measured as of the time *before* the bankruptcy petition itself. Damages, therefore, could be calculated by subtracting the expected value of the shares at the time of the decision to file for bankruptcy from the expected value of the shares had the directors opted for an alternative to bankruptcy." *Dux Capital Mgmt. Corp.*, 2004 WL 1936309, at *16.

whether they were the real-party-in-interest at the time of judgment. Plaintiffs do not attempt to establish that they had standing or legal right to the shares as of May 9, 2001. Defendants argue that whether Dux had standing or was the real-party-in-interest are separate issues and that Dux does not have standing.

[4] We hold that Dux does not have standing to sue on the Minority Shareholder claim. Whether or not Dux was the real-party-in-interest, it lacks standing. In order to have standing, Dux must show injury in fact. *See Lujan*, 504 U.S. at 560. If Dux did not own the shares at the time that the injury (breach of fiduciary duty) was inflicted and damage to the value of the stocks was sustained, then it did not suffer any injury in fact.[9] Paragraph 12.18 of the Chen-Dux Settlement Agreement clearly provides that the court's good faith determination is "a condition to the validity and enforceability of this Agreement," and the California superior court did not make this finding until July 25, 2001. Thus, as the district court correctly held, on May 9, 2001, "George Chen retained all his legal rights as a minority shareholder of Long Life and was under no duty yet to transfer the shares or the right to vote to Dux. (Thus, the cause of action accrued to George Chen. There was no assignment of the cause of action.)." *Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *3.[10]

---

[9]Under California law, shareholder status is based on record ownership of shares. Cal. Corp. Code § 185 (shareholder is "one who is a holder of record of shares"); *see also id.* § 701(d) (shareholders of record are persons entitled to vote, attend meetings, receive dividends). Dux cannot be considered a shareholder of record vested with the right to pursue a direct shareholder action unless it received Chen's shares or recorded them by the time of the injury. Moreover, California law provides that there is no division between who owns the shares and has legal title to them and who has the right to recover for damages to them. *See id.* §§ 185, 701(d).

[10]Similarly, the Chen-Dux Settlement Agreement provides no support for Dux's position that Chen (or his bankruptcy Trustee) must ratify Dux's claim pursuant to Fed. R. Civ. P. 17(a). Dux relies on Paragraph 12.2, the further assurances provision, which states, "Each party to this Agreement

Moreover, we agree with the district court's analysis comparing the Chen-Dux agreement to the buy-sell agreement in *Stephenson v. Drever*, 947 P.2d 1301 (Cal. 1997). *See Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *3-4. In *Stephenson*, the plaintiff was an employee and minority shareholder in a closely held corporation. 947 P.2d at 1302. The buy-sell agreement between the plaintiff and the corporation provided that the corporation " 'shall have the right and obligation to repurchase' " all of the plaintiff's shares in the event of termination of employment. *Id.* After the plaintiff was terminated, there was a disagreement as to the fair market value of the shares, and the plaintiff did not deliver the shares back to the corporation. *Id.* at 1305. The plaintiff sued directors and officers of the corporation for breach of fiduciary duty that they owed as majority shareholders to him, the minority shareholder. *Id.* at 1302-03. Defendants argued that the plaintiff ceased having shareholder rights upon termination of his

---

shall execute all instruments and documents and take all actions as may be reasonably required to effectuate *this Agreement*." Settlement Agreement ¶ 12.2 (emphasis added). Dux argues that it cannot realize the "benefit of the bargain" because it lost the value of the shares in bankruptcy. But the further assurances provision provides only that further actions must be taken to effectuate "this agreement," and so the question is whether or not "this agreement" included the transfer or assignment of the minority shareholder claims to Dux. As the district court noted, "Dux was primarily concerned about protecting its interest in the shares themselves," and at the time the agreement was made, no one contemplated any minority shareholder claims. Order Affirming Bankruptcy Court Decision at 7.

Moreover, as the Trustee persuasively argues, the terms of the settlement agreement involved transfer of shares, without any warranty as to value. *See* Settlement Agreement ¶ 1. It is true that at the time of the agreement, the shares were assigned the fair market value of $2. However, "[b]y making the superior court's approval an explicit condition of the settlement agreement, Dux knowingly accepted the risk that the value of the stock would decrease in the interim, even independent of a bankruptcy filing." Order Affirming Bankruptcy Court Decision at 7. Conversely, Chen accepted the risk that the value of the stock would increase and the settlement would be approved, or that it would decrease and he would have to keep the stock if the settlement were not approved.

employment and thus lacked standing to sue. *Id.* The *Stephenson* court held that unless something in the agreement indicated to the contrary, plaintiff retained legal title to the shares "with all the rights appurtenant." *Id.* at 1305.[11]

[5] Likewise, nothing in the Chen-Dux Settlement Agreement indicates that Dux had any right to the shares prior to the good faith determination by the California superior court. Furthermore, the agreement had a provision for making Dux's voting rights valid "during the pendency of any writ of mandate which may be filed by any party to the Action to overturn the Court's determination of good faith." Settlement Agreement ¶ 12.18. But, as the district court held, "No similar voting right was created pending the *initial* application for good-faith determination. . . . The fact that the settlement agreement expressly provided rights in one situation and not another tends to negate any inference that the parties intended for Dux to obtain voting rights or any other rights prior to the superior

---

[11]On appeal, Dux has apparently given up on the argument that it had legal title to the 200,000 LLNC shares as of May 9, 2001. Instead, it argues that it would be unfair to deprive it of standing since it ultimately suffered the loss in value of those shares. Although Dux does not quite put it in these terms now, this is similar to the "beneficial owner" theory it argued (and lost) below. *See Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *5 (holding that beneficial owners may not bring direct actions and that Dux's suit on the minority shareholder claim was a direct action because it alleged that the defendants' failure to hold an annual meeting prevented it from electing directors to the board). What *Stephenson* illustrates, however, is that the record shareholder also possesses all the legal rights appurtenant to that status, unless the parties have agreed otherwise. *Stephenson*, 947 P.2d at 1305. Under the California Corporations Code, shareholders have a wide range of rights to participate in corporate governance. *Id.* at 1306-08. As in *Stephenson*, Dux's theory that Chen's shareholder rights were cut off before legal title was delivered "would have the effect of stripping [Chen] of all these statutory shareholder's rights even though he remains the legal owner of record of shares . . . . A shareholder without a shareholder's rights is at best an anomaly, and at worst a shadowy figure in corporate limbo who would be voiceless in the conduct of the business of which he is part owner and largely defenseless against neglect or overreaching by management." *Id.* at 1307.

court's *initial* determination of good faith." *Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *4. Thus, Dux could not have standing to sue as a minority shareholder unless Chen assigned that cause of action to it. There is nothing in the Chen-Dux Settlement Agreement providing for such an assignment. "As in *Stephenson*, the record owner George Chen retained all legal rights and thus would have standing. Dux obtained no legal rights prior to May 9, 2001." *Id.*

*Siegel v. Anderson Homes, Inc.*, 118 Cal. App. 4th 994 (2004), which held that the cause of action for building damage accrues to the owner who suffers a compensable economic injury, even though the damage to the building occurred prior to the time the plaintiff owned the building, does not provide support for Dux's position. In general, "a cause of action accrues at the moment the party who owns it is entitled to bring and prosecute an action thereon." *Id.* at 1003 (internal citations and quotation marks omitted). But when the property damage is not discovered until later, "a cause of action for construction defects does not accrue until the property owner discovers the resulting damages." *Id.* at 1009. In *Siegel*, the defect was latent, so the original owner was not aware of the defect to the building when he sold it to the plaintiff. Since plaintiffs and not the original owner discovered the damage, the cause of action accrued to plaintiffs. In other words, when the original owner sold the house to plaintiffs, the price of the house presumably did not reflect the latent defect, and plaintiffs paid more for it than they would have had they known about the defect. They got the short end of the stick.

Here, in contrast, George Chen — the original owner of the 200,000 shares of LLNC stock — was aware of the loss of value to the stock caused by the decision to file bankruptcy. The cause of action accrued to him. Although Dux and Chen reached their settlement (on April 25, 2001) before damage to the stock value occurred, an express condition of the settlement was that it would not be final until a court made the

good faith determination. It was clear to both parties that that determination would take some time,[12] and thus Dux bore the risk that the stock value would decrease during that time, while Chen bore the risk that the stock value would increase during that time.

**[6]** For these reasons, whether or not Dux was the real-party-in-interest, it does not have standing, and it cannot cure its standing problem through an invocation of Fed. R. Civ. P. 17(a). Plaintiffs do not cite any case law for their assertion that the time that a lawsuit is filed is relevant to the standing inquiry. Being the owner of the shares at the time of the injury, Chen legally suffered the shares' loss in value. It just turned out that this loss had no economic effect on him because he had already agreed to transfer the shares to Dux shortly thereafter for a set price pursuant to their executed settlement agreement. "Rule 17(a) does not give them standing; 'real party in interest' is very different from standing." *Kent v. N. Cal. Reg'l Office of the Am. Friends Serv. Comm.*, 497 F.2d 1325, 1329 (9th Cir. 1974) (holding that the trustees of a trust fund in which taxpayers' money was kept were the real-parties-in-interest with respect to the trust fund, but they did not have standing to sue the government to enjoin collection of the taxes in the trust fund, because only the taxpayers themselves had standing); *see also* 6 Wright & Miller, Federal Practice and Procedure § 1542.

### B. Plaintiffs' Breach of Fiduciary Duty Claims Are Not Preempted by the Bankruptcy Code

Defendants argue that plaintiffs' breach of fiduciary duty claims are preempted by federal bankruptcy law because they are claims that LLNC directors improperly used the bank-

---

[12]Paragraph 12.18 of the Settlement Agreement provided, "The Parties to this Agreement agree and understand that an application for good faith settlement will be filed in the Action . . . and is expected to be heard on May 7, 2001."

ruptcy process and such claims must be litigated in bankruptcy court. Defendants first raised the preemption argument in a Fed. R. Civ. P. 50(b) motion. Although the parties dispute whether this preemption defense is waived due to failure to timely raise it, we hold in any case it would fail on the merits.

**[7]** Plaintiffs' breach of fiduciary duty claims are not preempted by federal bankruptcy law because these claims concern conduct that occurred *prior to* bankruptcy. The cases upon which defendants rely hold only that state law causes of action for abuse of process and malicious prosecution involving conduct that occurred *during* bankruptcy are preempted. *E.g.*, *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910 (9th Cir. 1996) (holding that state malicious prosecution actions for events taking place within bankruptcy court proceedings are preempted); *Gonzales v. Parks*, 830 F.2d 1033 (9th Cir. 1987) (holding that state courts lack jurisdiction over claim that filing of a bankruptcy petition is an abuse of process); *see also Miles v. Okun* (*In re Miles*), 430 F.3d 1083, 1091 (9th Cir. 2005) (holding that 11 U.S.C. § 303(i) provides the exclusive basis for awarding damages based on involuntary bankruptcy petition filing).

*MSR Exploration* and *Gonzales* involved claims between creditors and debtors that were litigated in bankruptcy court, involved the bankruptcy process, or otherwise required consideration of what relief was available under federal law. For example, in *MSR Exploration*, a creditor filed a claim against the debtor in bankruptcy court, and the bankruptcy court sustained the debtor's (MSR Exploration's) objection to the creditor's claim. Instead of pursuing sanctions or another remedy in bankruptcy court, the debtor waited until after the reorganization plan was confirmed and filed a state law malicious prosecution claim against the creditor in district court. *MSR Exploration*, 74 F.3d at 912. We held, "Whether creditors should be deterred, and when, is a matter unique to the flow of the bankruptcy process itself—a matter solely within the hands of the federal courts." *Id.* at 916. Disputes between

creditors and debtors are a central part of the management of the bankruptcy process, and allowing state law to resolve such disputes would undermine the uniformity of federal bankruptcy law. *Id.* at 914 (noting that Congress intended to "create a whole system under federal control which is designed to bring together and adjust all of *the rights and duties of creditors and embarrassed debtors* alike.") (emphasis added); *see also In re Miles*, 430 F.3d at 1089-90; *Gonzales*, 830 F.2d at 1035-36.

Similarly, in *Gonzales*, a debtor filed a bankruptcy petition in an attempt to delay a creditor foreclosure sale. The creditor subsequently filed an abuse of process claim in state court, and the state court entered a judgment against the debtor. *Gonzales*, 830 F.2d at 1033-34. The debtor filed an adversary proceeding in bankruptcy court seeking relief from the state court judgment. *Id.* at 1034. We held that "[f]ilings of bankruptcy petitions are a matter of exclusive federal jurisdiction" because "[s]tate courts are not authorized to determine *whether a person's claim for relief under a federal law*, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one." *Id.* at 1035 (emphasis added).

**[8]** By contrast, Dux and Davis did not allege that LLNC's bankruptcy petition was filed in bad faith, and their claim does not require the adjudication of rights and duties of creditors and debtors under the Bankruptcy Code. The complaint alleged that the directors and majority shareholder engaged in self-dealing to the detriment of the corporation through their decision to pursue bankruptcy and sought damages for breach of fiduciary duty under California state law. Unlike in *MSR Exploration* and *In re Miles*, the complaint was not "self-consciously and entirely one which seeks damages for a claim filed and pursued in the bankruptcy court," *MSR Exploration*, 74 F.3d at 912; *see In re Miles*, 430 F.3d at 1092-93 (noting that "[t]he complaints state on their faces that Appellants seek damages for the filing and prosecution of the involuntary bankruptcy petitions against their relatives. . . . Because

Appellants' complaints allege state law tort causes of action for damages entirely predicated upon the filing and prosecution of involuntary bankruptcy petitions, they necessarily 'arise under' title 11."). Simply put, state corporate governance law, not federal bankruptcy law, governs the duties of a corporate fiduciary. *See FDIC v. Barton*, 1998 WL 169696, at *4 (E.D. La. April 8, 1998) (holding that federal bankruptcy law does not preempt the FDIC's claim against defendants under Louisiana state law for breach of fiduciary duty in connection with defendants' bankruptcy filing).

Finally, as the district court correctly noted, the bankruptcy court explicitly assigned to plaintiffs all pre-bankruptcy claims of LLNC against its directors and the Yageo defendants, over defendants' objections. Defendants argue that the bankruptcy court could not assign claims over which it had exclusive jurisdiction. Even if this were true, plaintiffs' breach of fiduciary duty claims are not based on "activities that might be undertaken in the management of the bankruptcy process." *MSR Exploration*, 74 F.3d at 914. Since the bankruptcy court limited the assignment to claims that "existed on May 9, 2001 (i.e., immediately prior to the Chapter 11 filing)," the assignment was valid.

### C. Res Judicata Does Not Bar Plaintiffs' Breach of Fiduciary Duty Claims

**[9]** "The doctrine of res judicata bars a party from bringing a claim if a court of competent jurisdiction has rendered final judgment on the merits of the claim in a previous action involving the same parties or their privies." *Robertson v. Isomedix, Inc.* (*In re Int'l Nutronics, Inc.*), 28 F.3d 965, 969 (9th Cir. 1994) (citation omitted). Since the bankruptcy court issued a final judgment on the merits, and that action involved the same parties or their privies, the issue here is whether the LLNC claim was or could have been litigated by the Trustee (who became the owner of any claims of LLNC against its directors after the bankruptcy petition was filed) in the bank-

ruptcy court and whether the two causes of action were the same.

The order of confirmation explicitly reserved all claims and causes of action for the benefit of the estate to the Disbursing Agent (former Trustee). After confirmation, the bankruptcy court authorized the Disbursing Agent "to transfer and assign to Davis/Dux certain of Debtor's claims that existed on May 9, 2001 (i.e., immediately prior to the Chapter 11 filing), as described in and according to the terms of the Letter Agreement." Order Authorizing Compromise ¶ 6. This assignment was part of a settlement agreement that the Disbursing Agent reached with Dux and Davis in connection with their claims against the estate of LLNC. In return, Dux and Davis waived their general unsecured claims against the LLNC estate except for seeking payment of administrative expenses. The bankruptcy court authorized the assignment over Rextron and Equity Plus's objections.

Defendants argue that (1) the Trustee could have litigated the breach of fiduciary duty claim of LLNC against its directors during the bankruptcy proceeding, (2) Dux/Davis actually litigated the claim and lost, (3) the assignment of claims to Dux/Davis was too general to prevent preclusion, and (4) the trustee was required to assert the claims before the order of confirmation. Plaintiffs respond that (1) defendants should have appealed the bankruptcy court's assignment of claims to Dux/Davis, and their failure to do so bars their claim, (2) the LLNC claim does not pertain to the confirmation plan and therefore was not the same claim, and (3) the bankruptcy court did not resolve the LLNC claim because it expressly reserved it and assigned it to plaintiffs.

[10] Res judicata does not bar plaintiffs' LLNC claim for several reasons. First, the LLNC claim is a claim for breach of fiduciary duty that does not "pertain[ ] to the [reorganization] plan." *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (holding that "[o]nce a bankruptcy plan is confirmed,

it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect."); *see also Heritage Hotel Ltd. P'ship I v. Valley Bank of Nev.* (*In re Heritage Hotel Ltd. P'ship I*), 160 B.R. 374, 377 (9th Cir. B.A.P. 1993), *aff'd*, 59 F.2d 175 (9th Cir. 1995) (unpublished table decision); *Kelley v. S. Bay Bank* (*In re Kelley*), 199 B.R. 698, 702 (9th Cir. B.A.P. 1996) ("a chapter 11 bankruptcy case 'comprise[s] all matters pertaining to the debtor-creditor relationship that [the debtor] or any creditors might . . . raise[ ] to advance their interests in the proceeding' ") (citation omitted and alteration in original).

**[11]** Second, plaintiffs' claim for breach of fiduciary duty on the part of the Rextron-controlled directors was not decided by the bankruptcy court. While Dux/Davis did argue that the reorganization plan should not be confirmed because it was not filed in good faith, the breach of fiduciary duty claim with respect to the directors and the majority shareholder was not raised in, much less decided by, the bankruptcy court. The breach of fiduciary duty claim that Dux raised in its motion to appoint a Chapter 11 Trustee was based on debtor LLNC's fiduciary duty to creditors and shareholders *in bankruptcy*. This is clearly a different duty than that of the board of directors and Rextron to the corporation itself and the minority shareholders prior to bankruptcy. Moreover, Dux's objection to the reorganization plan as being in bad faith in violation of 11 U.S.C. § 1129(a)(3) was not the same as a breach of fiduciary duty claim under California corporate law.

The Trustee recommended confirmation of the plan in part because the parties could resolve their intra-corporate disputes afterwards:

> there are a number of factual and legal issues that simply will not be resolved before the continued confirmation hearing set for November 26, 2001 . . . . Equity Plus has indicated that it may withdraw

its "offer" if a sale . . . is not approved at [that time]. As a result, the Trustee believes that the Court should proceed to sell the assets and business to Equity Plus under the general terms set forth in the Plan . . . . The parties (Davis/Dux, Rextron and Equity Plus) will retain whatever rights they may have against one another and can litigate their disputes after consummation of the sale.

Trustee's Report and Recommendation Pursuant to Bankruptcy Code § 1106 and Court Order at 3-4. Similarly, the bankruptcy court questioned whether the entire bankruptcy proceeding was "on the up and up" and reserved the pre-petition claims for later resolution. Thus, plaintiffs' claims were not, as defendants argue, "thoroughly aired and rejected" by the Trustee and the bankruptcy court. They were explicitly reserved.

[12] Third, the bankruptcy court's authorization of the assignment of the LLNC claim to plaintiffs was valid. The confirmation order did not extinguish plaintiffs' LLNC claim. LLNC's plan of reorganization provided, "The Disbursing Agent shall have the right to pursue any and all Retained Claims and other pre-petition obligations or claims in favor of the Debtor . . . . No such claims shall be waived or relinquished under the Plan or by virtue of its Confirmation. The Disbursing Agent hereby reserves all Claims, defenses, powers and interests of the Debtor and/or Trustee, existing as of Confirmation." Debtor's Chapter 11 Plan of Reorganization Dated August 29, 2001 ("Plan of Reorganization") at 8. The plan defined "Retained Claims" as "all claims that Debtor had as of the Filing Date." *Id.* at 3. The plan's definition of "claim" included the LLNC claim. *See id.* at 1. The effect of the confirmation was to discharge the debtor — LLNC — from all claims, not the directors or Rextron, the majority shareholder. *See id.* at 12 ("Confirmation of the Plan will discharge Debtor from all liability for Claims arising prior to Confirmation . . . .").

In confirming the plan, the bankruptcy court provided that all claims "are reserved for the benefit of the estate and may be asserted by the Disbursing Agent." Confirmation Order ¶ 10. Pursuant to a settlement between the bankruptcy estate of LLNC and plaintiffs, the Disbursing Agent assigned those claims to plaintiffs. *See* Letter Agreement Dated March 15, 2002 ("Letter Agreement") at 1-2. The bankruptcy court approved this assignment. Order Authorizing Compromise at 2; *cf. Trulis*, 107 F.3d at 689-91 (holding that res judicata barred plaintiffs' claim where plaintiffs did not appeal bankruptcy court's order confirming reorganization plan that included explicit provision barring such action). The court, therefore, was ratifying the Trustee/Disbursing Agent's choice explicitly to reserve the claim for plaintiffs rather than to raise the fiduciary duty claim during the during the bankruptcy proceeding. Moreover, as the district court held, "there is no evidence to indicate that the bankruptcy court discharged the potential liabilities of these non-debtor defendants to non-debtor plaintiffs." Summary Judgment Order at 17. In fact, it was precisely because the bankruptcy court believed that these claims were too complicated to be litigated in the bankruptcy proceeding that it reserved them for dispute in another forum.

**[13]** Finally, the Trustee's assignment of all pre-petition claims to Dux/Davis was not so general as to render it invalid. To support their argument that the Trustee's assignment was too general, defendants rely on *In re Kelley*, which suggests that a blanket reservation is insufficient to prevent application of res judicata to a specific action, *see* 199 B.R. at 704. However, the Bankruptcy Appellate Panel subsequently limited that language. *See Akary Corp. v. Sims* (*In re Associated Vintage Group, Inc.*), 283 B.R. 549, 563-64 (9th Cir. B.A.P. 2002) ("While we did find the purported reservation in the *Kelley* plan to be . . . vague in the context of all the facts of that case, and observed that another court had once found a general reservation to [sic] rights to be insufficient, our comment was pure dictum . . . and cannot be construed as a gen-

eral statement of law. . . . We agree with the other courts that regard it as impractical and unnecessary to expect that a disclosure statement and plan must list each and every possible defendant and each and every possible theory.") (citations omitted). Together, the Letter Agreement, the bankruptcy court order, and the Trustee's recommendation show that the claims intended to be assigned were the corporate governance claims.[13]

## D.   District Court's Damages Calculations Were Not Erroneous

As of May 3, 2001, there were 646,153 shares of common and 1,507,695 shares of Series A preferred convertible stock issued and outstanding. On May 7, 2001, An-Ehr Chen requested that the LLNC board of directors convert 700,000 of Rextron's shares of preferred stock to common. On May 8, 2001, the board granted that request. The jury was asked to determine whether plaintiffs proved that the common stock of LLNC had any value as of the company's petition to commence bankruptcy proceedings. The jury was also asked to determine the value (both total and per share) of the shares transferred pursuant to the Chen-Dux Settlement Agreement. Those transferred shares were common. The jury found that the common stock was worth $2 per share.

In its June 30, 2004 Judgment, the district court calculated damages as $2,692,306, which included Rextron's 700,000 shares that had been converted to common on May 8, 2001. This figure did not include the preferred shares because the jury never was asked to determine a loss in value for the pre-

---

[13]The Letter Agreement provided that Davis/Dux would receive assignment of all pre-petition claims, excluding claims arising under the Code, against "[t]he attorneys for LLNC, including Gayle Chan, Michael Lee, . . . George Chen, An Erh Chen [sic], Pierre Chen, Equity Plus, Yageo, Rextron and/or their affiliates; and [t]he LLNC directors and officers." Letter Agreement at 1-2.

ferred shares due to the bankruptcy filing. In its Amended Judgment, the district court removed the 700,000 shares from its earlier calculation because they had not been converted to common until May 8, 2001, after the May 3 board resolution to petition for bankruptcy. Thus plaintiffs' damages award was revised downward to $1,292,306 ($2 per share x 646,153 common shares). *See Dux Capital Mgmt. Corp.*, 2004 WL 19396309, at *19.

Plaintiffs cross-appeal this damages calculation and make two arguments. First, they argue that there was sufficient evidence to show the preferred shares had a minimum value of $2 per share, since they were at least as valuable as the common shares. They argue that the district court should have included this "minimum value" of the preferred stock in its damages calculation and that the parties agreed to use the value of all LLNC stock to measure damages on the assigned LLNC claim. Second, they argue that the 700,000 converted shares should not have been excluded from the damages calculation because while the LLNC claim accrued on May 3, 2001, the amount of damages was not tied to that date.

**[14]** The district court did not err in excluding the preferred shares from its damages calculation. Plaintiffs' theory of damages on the assigned LLNC claim throughout trial and after trial did not include damage to the preferred shares. Before trial, they sought relief for diminution in value of the company as a going concern and loss of goodwill. *See* Joint Final Pretrial Order at 7. During trial, plaintiffs urged the jury to find that the common shares were worth at least $2 per share, but they never urged the jury to make any finding with regard to the preferred shares. During the discussions about the special verdict form and the jury instructions, plaintiffs did not request the inclusion of any instruction or question to the jury regarding the value of the preferred shares. After trial, plaintiffs clearly recognized that LLNC had both outstanding common and outstanding preferred shares,[14] but they nonetheless

---

[14]*See* Pls.' Post-Trial Br. Re: Issues of Standing and Damages at 8 (noting that at the time of the bankruptcy filing, there were 807,695 preferred shares and 1,346,153 common shares issued).

asked the district court to calculate damages based only on the outstanding common shares. *See* Pls.' Post-Trial Br. at 9 (arguing that "[t]he findings by the jury of the share value of $2.00 results in the following damages in addition to punitive damages assessed by the jury: To Dux as an individual plaintiff: $2.00/share x 200,000 shares: $400,000; To Dux and Davis jointly as assignees of the claims of LLNC: $2.00/share x 1,346,153 shares: $2,692,306."). Plaintiffs cannot complain on appeal about a damages calculation they never asked the district court to make.

Moreover, no evidence concerning the value of the preferred shares was presented at trial. *See Dux Capital Mgmt. Corp.*, 2004 WL 2472247, at *7 (noting that "[a]t trial, the only evidence proffered was for the value of common shares. Hence, plaintiffs only proved, as found by the jury, the value of the common stock at $2 per share."). The jury did not determine the value of the preferred shares; it determined only that plaintiffs proved that the common stock of LLNC had value as of the bankruptcy petition, and that the (common) shares transferred between Chen and Dux were worth $2 per share.

Pointing to LLNC's Articles of Incorporation, plaintiffs argue that the preferred shares must have been worth at least as much as the common shares, since the preferred shares "enjoyed significant procedural and financial benefits over the common shares." The Articles of Incorporation provided that the holders of the preferred shares enjoyed certain rights superior to that of the common shares, including the right to receive greater dividends and the right to elect three of the five directors to the board. Even so, the fact remains that plaintiffs presented no evidence at trial to establish the value of the preferred shares, and they did not ask the jury to determine the value of the preferred shares. It is no surprise, then, that the jury determined only the value of the common shares. The jury did not make any finding on the "minimum value" — or any value — of the preferred shares. Damages are

recoverable to the extent they are reasonably certain, but they still must be proved. *See, e.g.*, *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 695 (2004); *Mendoyoma Inc. v. County of Mendocino*, 8 Cal. App. 3d 873, 880-81 (1970).

As assignees of the corporate LLNC claim, plaintiffs would have been entitled to the loss in value for all the corporation's shares, preferred and common, if they had timely made a request in the district court to include the preferred shares in the damages calculation.[15] At this point, however, we cannot grant plaintiffs' request to instruct the district court to enter judgment for $4,307,700 on this claim. The district court did not err in excluding the value of the preferred shares in its damages calculation.[16]

Plaintiffs also argue that the district court erred by amending its judgment to exclude Rextron's 700,000 converted shares in the damages calculation. Defendants respond that while the amount of damages may increase after the injury is

---

[15]Although corporate injury is usually demonstrated through means other than stock value, the plaintiffs' evidence at trial solely focused on this measure.

[16]Plaintiffs point out that they raised the argument about preferred shares having at least equivalent value to the common shares in the district court. However, this argument was raised subsequent to the post-trial brief on damages, and it was too late at that point to change the damage theory. Moreover, even then, their argument to the district court did not request an award of damages based on the preferred stocks' value, but instead was an effort to refute the defendants' argument that the plaintiffs should receive *no* recovery when they had not proved damage to the entire body of LLNC's stock. The district court's holding that the plaintiffs did not oppose reducing the award, as opposed to vacating it entirely, accords with this reading. *See Dux Capital Mgmt. Corp.*, 2004 WL 1936309, at *18. Tellingly, plaintiffs point to no instance when they asked the district court to *increase* the damage award on the assigned corporate claim. Yet, if damage to the preferred stock was part of their theory of the case, the award calculation on this claim was always inadequate — even before the district court amended the judgment to exclude the 700,000 common shares held by Rextron.

sustained, there must be further injury to the corporation as a whole, not just to some shares.

The district court did not err in amending the judgment to exclude the 700,000 converted shares from its damages calculation. The injury for which the jury determined that plaintiffs should be compensated was the loss of value in the shares and injury to the corporation caused by the board of directors' decision to pursue bankruptcy on May 3, 2001. Therefore, the damaging action was complete before those shares came into existence, and those shares cannot be the basis for assessing that already-complete action. The question was whether the directors violated their "duty to weigh the various alternative courses of action for the corporation and to select the one best calculated to return the most value for the shareholders as a whole." Jury Instruction XIX. Those 700,000 Rextron shares were not converted to common until after the board's decision to petition for bankruptcy on May 3, 2001. Morever, the jury determined that the common shares had a value of $2 per share prior to this board decision and no value afterwards. If the jury found that the common shares had zero value on May 3, then the Rextron shares that were converted into common shares on May 8 had zero value, and plaintiffs' damages could not be increased even if it were proper to increase damages for shares converted to common only after May 3, 2001.

## E.   Plaintiffs' Fed. R. Civ. P. 60(b) Motion

[15] Once an appeal is filed, the district court no longer has jurisdiction to consider motions to vacate judgment. *Gould v. Mut. Life Ins. Co. of N.Y.*, 790 F.2d 769, 772 (9th Cir. 1986). However, a district court may entertain and decide a Rule 60(b) motion after notice of appeal is filed if the movant follows a certain procedure, which is to "ask the district court whether it wishes to entertain the motion, or to grant it, and then move this court, if appropriate, for remand of the case." *Id.* (internal quotation marks and citations omitted); *see also Defenders of Wildlife v. Bernal*, 204 F.3d 920, 930 (9th Cir.

2000) (holding that a district court order declining to entertain or grant a Rule 60(b) motion is not a final determination on the merits); *Scott v. Younger*, 739 F.2d 1464, 1466 (9th Cir. 1984) (holding that the district court's denial of a request to entertain a Rule 60(b) motion is interlocutory and not appealable and that if the court is inclined to grant the motion, the movant first should request limited remand from the appellate court); *Crateo, Inc. v. Intermark, Inc.* (*In re Crateo, Inc.*), 536 F.2d 862, 869 (9th Cir. 1976) (declining to order a remand after the district court declined to entertain the Rule 60(b) motion).

Here, an amended judgment was filed on August 31, 2004. Notice of appeal was filed on September 20, 2004. Plaintiffs filed their motion asking the district court to entertain and grant their Rule 60(b) motion on October 1, 2004. On October 4, 2004, the district court denied plaintiffs' request to entertain their motion. The same day, plaintiffs filed their cross-appeal. On November 3, 2004, plaintiffs appealed the district court's refusal to entertain their motion. On November 23, 2004, defendants moved to dismiss this appeal for lack of jurisdiction and urged that if the court construed plaintiffs' appeal as a motion for limited remand, it should be denied. Plaintiffs then recast their appeal as a motion for limited remand, which asked us to require the district court to decide the Rule 60(b) motion on the merits. The Appellate Commissioner denied plaintiffs' motion for limited remand without prejudice to the jurisdictional issues on January 5, 2005.

**[16]** Plaintiffs have followed the procedures outlined in *Gould*. They filed their Rule 60(b) motion after their notice of appeal. They asked the district court whether it wished to entertain or grant their motion, and the district court declined to entertain it. They moved for limited remand, and we denied it on January 5, 2005. Yet, plaintiffs ask for remand again.[17]

---

[17]Plaintiffs erroneously urge that we review the district court's refusal to entertain their motion under an abuse of discretion standard. The abuse

We decline this second request for remand. In any case, the issue is moot, since we hold that plaintiffs cannot cure their standing defect through the use of Fed. R. Civ. P. 17(a).

## IV.   CONCLUSION

For the foregoing reasons, the district court is AFFIRMED.

---

of discretion standard is applicable when the district court actually ruled on the merits of a Rule 60(b) motion, *Barber v. Hawaii*, 42 F.3d 1185, 1198 (9th Cir. 1994); here, the district court did not rule on the merits of plaintiffs' Rule 60(b) motion.